**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA**

vs.  **CASE NO.: 4:06-CR-067-SPM**

**JAIME AMBRIS-SEBASTIAN,**

    **Defendant.**
_____/

**ORDER DENYING MOTION TO SUPPRESS EVIDENCE**

**THIS CAUSE** comes before the Court upon the "Motion to Suppress Evidence" (doc. 19) filed October 3, 2006 and the Government's response (doc. 20) filed October 11, 2006. Defendant seeks to suppress evidence of the counterfeit alien registration card and any other evidence found in his possession on August 17, 2006 at a trailer park in Tallahassee, Florida. The Court held a hearing on October 16, 2006 at which both sides presented evidence and testimony.[1]

In his motion, Defendant states that he was a passenger in a vehicle that entered the trailer park and pulled up to a taco stand on the premises. Defendant alleges that he was asked by law enforcement agents to exit the vehicle, and that when he did so, an agent searched him, asked him for his "papers," took his wallet

---

[1] The hearing contained testimony and evidence pertaining not only to Defendant, but to another individual named Diaz-Pimentel, because both encounters occurred on the same night and involved the same set of facts.

out of his pocket, and looked inside, discovering the counterfeit cards at issue.

At the hearing, the Government presented three witnesses. The first was Charles McCall, a special agent with Immigrations and Customs Enforcment (ICE). He testified that he first encountered Defendant near a picnic table by the taco stand, along with two females and two other males. After asking a few questions in English and receiving no response, McCall asked fellow agent Oscar Gonzalez to communicate in Spanish with Defendant and determine his alienage.

In response to Gonzalez's questioning, Defendant reached in his pocket and produced an alien registration card and a social security card. Recognizing the cards to be counterfeit, McCall placed Defendant under arrest and escorted him to a transport van. McCall testified that at no time did he ever reach into Defendant's pockets or pull a wallet from Defendant's clothing.

Next on the stand was Gonzalez, who conducted the alienage interview with Defendant. Gonzalez was summoned by radio to assist McCall and went to the taco stand as requested. Upon encountering the small group at the picnic table, he asked them if they spoke English. Receiving no response, he asked, in Spanish, whether they spoke Spanish. All of the individuals responded affirmatively.

Gonzalez first addressed them collectively, explaining why he was there, and then questioned each person individually. Gonzalez asked Defendant whether he was present in the United States legally and whether he had any type of paperwork to prove it. In response, Defendant handed him two cards. Gonzalez stated that Defendant already had the cards in his hand and did not need to retrieve them from

a wallet or pocket. Gonzalez recognized the cards as counterfeit and directed Defendant to sit at the picnic table to be taken into custody.

The final witness to be called was Philip Reynolds, another ICE agent, who guarded the perimeter of the trailer park and questioned drivers who attempted to pass through the perimeter and gain entrance into the park. He did not recall having any contact with Defendant that evening and provided no other relevant information.

Finally, Defendant testified. He stated that he rode to the trailer park with another man, Hector, to buy dinner at the taco stand. After parking the car, Defendant and Hector were approached by an agent who directed the driver out of the car. A few minutes later, Defendant was told to exit the car as well. Defendant testified that at this point, the officer said something to him that he did not understand and then placed Defendant's hands on top of his head. Defendant also stated that he was asked whether he had "papers," but that he did not respond because he did not know what kinds of papers the agent was referring to. According to Defendant, the agent then handcuffed Defendant and took his wallet, where the counterfeit cards were discovered.

There is considerable conflict about what actually transpired immediately before and after Defendant was handcuffed. Gonzalez testified that in response to his questions, Defendant reached in his wallet and pulled out the cards. McCall, who was standing, by his own admission, right next to Gonzalez, stated that Defendant already had the cards in his hand. Defendant, on the other hand, alleges that after he was handcuffed, one of the agents took his wallet from him and pulled

the cards out of it.[2]  Furthermore, while Defendant contends that he first encountered law enforcement while still inside the parked car, both McCall and Gonzalez testified that they approached him as he was standing by the picnic bench near the taco stand.  To add to the confusion, Defendant believes that he did not interact with either McCall or Gonzalez until he was transported to a different location where he was held overnight.  However, all parties seem to agree on the key fact that Defendant was questioned before he was handcuffed or searched.

**ANALYSIS:**

8 C.F.R. § 287.8(b) permits immigration agents to interrogate and detain individuals in order to determine whether they are illegal aliens:

> (b) Interrogation and detention not amounting to arrest.
>
> (1) Interrogation is questioning designed to elicit specific information. An immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away.
>
> (2) If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.
>
> (3) Information obtained from this questioning may provide the basis for a subsequent arrest, which must be effected only by a designated

---

[2] Complicating matters is the fact that Defendant claimed he did not understand much Spanish.  This occurred both on the night in question, when Defendant told Gonzalez that he did not understand Gonzalez's Spanish, and during the hearing, when he said he did not understand the Spanish interpreter, despite the fact that he had been responding without apparent difficulty to questions put to him throughout his testimony.  Having presided over the hearing and having witnessed the communication among Defendant, his interpreter, and the questioning attorneys, it does not appear that Defendant's language skills were so impaired as to raise a question about the integrity of the proceedings.

immigration officer, as listed in 8 CFR 287.5(c). The conduct of arrests is specified in paragraph (c) of this section.

Defendant testified that once he exited the vehicle, the agent took Defendant's hands and placed them on the sides of his head. To the extent that this could be considered restraint, a Terry[3] stop is not automatically converted into an arrest by handcuffing or using other means of restraint. United States v. Kapperman, 764 F.2d 786, 790 n.4 (11th Cir. 1985).

Assuming that Defendant was in fact detained for questioning, such detention is permitted by 8 C.F.R. § 287.8(b)(2). The agents were briefed before execution of the warrant and advised that the ICE office had received citizen complaints of Hispanic illegal aliens in the area possibly involved in a kidnapping/sex trafficking case. They were told that the trailer park was a "haven" for the aliens, and that the operation was large enough to require the involvement of up to 25 law enforcement officers. These articulable facts provided sufficient reason for agents to briefly detain and question individuals in the park.

Despite the discrepancies in testimony, all the witnesses related the same general sequence of events: 1) that Defendant was questioned; 2) it was determined that Defendant was not legally in the country; and 3) he was arrested and handcuffed. Whether the cards were produced before or after the arrest is immaterial: If Defendant showed them to the agents immediately, they would have

---

[3] Terry v. Ohio, 392 U.S. 1 (1968). Neither side disputes that the agent was conducting a Terry stop in this case.

provided an additional basis for arrest.  If the cards were located after being handcuffed and arrested, then they were the product of a search incident to arrest.  Under either scenario, the cards are admissible evidence.

Having considered the totality of the circumstances, the Court finds that Defendant has not met his "burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 132 (1978)(*citing* Simmons v. United States, 390 U.S. 377, 389-390 (1968); Jones v. United States, 362 U.S. 257, 261 (1960)).  Accordingly, it is

**ORDERED AND ADJUDGED** that the motion to suppress (doc. 19) is hereby *denied*.

**DONE AND ORDERED** this thirty-first day of October, 2006.

          *s/ Stephan P. Mickle*
          Stephan P. Mickle
          United States District Judge